```
 1                   UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2        --------------------------X
          SLOCUMB LAW FIRM,              Docket No. CA 11-1806
 3                         Plaintiff,

 4               v.                      Washington, D.C.
                                         October 20, 2011
 5                                       2:00 p.m.

 6        ZEKE ROESER, ET AL,            ***SEAL PORTION REDACTED***
                           Defendant.
 7        --------------------------X

 8                           TRO HEARING
                 BEFORE THE HONORABLE EMMET G. SULLIVAN
 9                   UNITED STATES DISTRICT JUDGE

10        APPEARANCES:

11        For the Plaintiff:     McKOOL SMITH, P.C.
                                 By:  Mr. Rodney Sweetland, III
12                                    Mr. Brandon M. Jordan
                                 1999 K Street, N.W.
13                               Suite 600
                                 Washington, D.C.  20006
14                               202.370.8366
                                 rsweetland@mckoolsmith.com
15                               bjordan@mckoolsmith.com

16        For the Defendant:     MORRISON & FOERSTER, LLP
                                 By:  Mr. Robert A. Salerno
17                                    Mr. Adam Hoffinger
                                 2000 Pennsylvania Avenue, N.W.
18                               Suite 6000
                                 Washington, D.C.  20006
19                               202.887.6930
                                 rsalerno@mofo.com
20                               ahoffinger@mofo.com

21        Court Reporter:        Catalina Kerr, RPR, CRR
                                 U.S. District Courthouse
22                               Room 6509
                                 Washington, D.C.  20001
23                               202.354.3258
                                 catykerr@msn.com
24
          Proceedings recorded by mechanical stenography, transcript
25        produced by computer.
```

```
 1                      P-R-O-C-E-E-D-I-N-G-S

 2              (2:00 P.M.; OPEN COURT.)

 3              THE DEPUTY CLERK:  Civil Action 11-1806, Slocumb Law

 4     Firm versus Zeke Roeser, et al.  Would counsel please identify

 5     yourselves for the record.

 6              MR. SWEETLAND:  Good afternoon, Your Honor.  May it

 7     please the Court.  I'm Rodney Sweetland.  I have with me my

 8     colleague Brandon Jordan from McKool Smith for the Plaintiffs,

 9     Slocumb Law Firm.

10              THE COURT:  All right.  Good afternoon.

11              MR. SALERNO:  Good afternoon, Your Honor.  Robert

12     Salerno and Adam Hoffinger from Morrison & Foerster.  And also

13     seated at counsel table are our clients.

14              THE COURT:  All right.  Good afternoon, counsel.

15     Let me also welcome -- I understand we have some students from

16     Howard Law School, first-year students, Professor Gavil's

17     class.  Welcome.  Welcome to the Court, and hopefully, I'll

18     have some time after this hearing to spend with you and we can

19     have our own discussion about whatever you want to talk about.

20              Let me just say this about the motion before the

21     Court today.  This scenario that you present to the Court is

22     one that's -- I don't want to say it's common in that we see

23     it, this type of scenario every week, but it's not uncommon to

24     see a lawsuit where attorneys have left a firm, started their

25     own and there's a discussion, if you will, about who's
```

1    property belongs to whom, and it's the -- I guess it's the

2    professionally equivalent to a divorce case.

3          Now, you have to -- you have to think why there's a

4    derth of published opinions about law firm breakups and

5    discussions about injunctive relief being available to the law

6    firms because former associates have left.  You've done your

7    research and we've done ours and there's not a lot written out

8    there about that type of issue.

9          And there's probably a pretty compelling reason why

10   not, and that's because these cases principally are about

11   money, oftentimes, and reputations and the ability to do

12   business and life goes on.  And when these breakups occur,

13   oftentimes they bruise feelings, they're feelings that -- of

14   betrayal and other types of feelings that are more attendant

15   to divorce scenarios where people feel as though they've been

16   victimized for a host of reasons, but life goes on.

17         And at some point it may well be -- I'm not sure

18   when that point is.  Maybe that point is today after the

19   hearing or midway through or maybe it's next week or maybe it

20   will never be, but the parties need to seriously think about

21   whether they wish to avail themselves of an opportunity to sit

22   down with either a magistrate judge or a mediator and see how

23   they can resolve their differences and so that life can go on

24   for the respective parties.

25         That's all I have to say about that, but I mean,

1   this is -- we've seen these types of cases before.  They're

2   not unusual.

3        But you have to ask yourselves why there are few

4   published opinions about a resolution in a court of law of

5   these issues on the merits, and the principal reason, I

6   suppose, is that -- that when the passion of the incident

7   wears off, people sit down and resolve their differences one

8   way or the other.  That's all I have to say about that.

9        You presented a motion to the Court, and maybe after

10  what I just said you're at the point now where you want to beg

11  me to go to a mediator, I don't know.  Are you at that point

12  now?

13       MR. SWEETLAND:  I'm afraid not, Your Honor.

14       THE COURT:  You're not there yet.  I need to talk

15  some more then, I guess.

16       But let me hear from Plaintiff's counsel first.  I

17  have a few questions I need to get answers to, and then I'll

18  give you a few minutes.  I mean, rest assured we read

19  everything, but I need for you to tell me just what is the

20  scope of this injunctive relief you're seeking, because

21  there's a -- a variance between what you've asked for in your

22  complaint and what you've asked for in your reply brief.

23       MR. SWEETLAND:  I'm very happy that Your Honor made

24  those preliminary remarks because it plays very well into that

25  question.  We want to freeze the status quo to give our client

1   time, and to whatever extent it's necessary, the Defendants

2   time to deal with an orderly transition.

3         What's happened here now --

4         THE COURT:  I need an answer to my question.

5         MR. SWEETLAND:  Okay.  The relief that we're looking

6   at is no more solicitation of clients, you know, period, as it

7   stands right now during the past -- during the temporary

8   restraining order.

9         THE COURT:  And that's what I thought you were

10  asking for because that's at variance with what you asked for

11  in your complaint.

12        But you're asking for essentially the Defendants to

13  cease and desist from soliciting -- actively soliciting

14  clients that you maintain were clients of the Slocumb Law Firm

15  then.

16        MR. SWEETLAND:  That's correct, Your Honor.  Or

17  stated a different way, stop using our client's trade secrets.

18        THE COURT:  All right.  Let me stop you for a

19  second.  Let me ask Defense counsel to approach.

20        MR. SALERNO:  Good afternoon, Your Honor.

21        THE COURT:  Good afternoon.  Is there any desire on

22  the part of your clients to continue -- I use that word with

23  some caution because I'm not suggesting that they've done

24  anything wrong at all, but is there any -- is there any desire

25  on the part of your clients to solicit clients who once were

 1   clients of the Slocumb Law Firm?  I'm talking about from this
 2   point forward.
 3         I'm not talking about what happened, what may have
 4   happened on October 7th and 8th, that's a different issue,
 5   but from this point forward is there any desire or intent on
 6   the part of your clients to solicit clients who were arguably
 7   clients of the Slocumb Law Firm?
 8         MR. SALERNO:  Your Honor, the solicitation point is
 9   moot because all of the --
10         THE COURT:  Wait a minute.  I can't get a clear
11   answer.  So the answer is no.
12         MR. SALERNO:  No, there are no further clients who
13   will be informed that they have left the firm and provided
14   with their options, which is what they did in the notification
15   letters.
16         THE COURT:  All right.  And I'm putting aside what
17   may have happened on October 7th and 8th.  So what you've
18   telling me then, as officers of the Court, they will not
19   solicit any clients who were originally clients of the Slocumb
20   Law Firm from this point forward.  Is that what you're telling
21   me?
22         MR. SALERNO:  Yes.  I think it depends on what
23   we're -- what we may mean by "solicit."  From our -- no, and
24   I'm not trying to be cute by that.  What has happened is there
25   are many clients who have said, "I received your letter; I

1   wish to be represented" --

2          THE COURT:  That's a little bit different from what

3   I'm saying.  I'm talking about them making active efforts to

4   encourage people from this point forward to allow them to

5   represent those --

6          MR. SALERNO:  I understand what Your Honor --

7          THE COURT:  As opposed to someone who may have been

8   contacted during the days of October 7th and 8th responding.

9   That's a little bit different.  It's a different scenario.

10  I'm talking about active efforts on their part.

11         MR. SALERNO:  No new individuals to be contacted who

12  have not already been contacted, I believe that is the case.

13  We just want to --

14         THE COURT:  I think -- Hold it.  Let me invite you

15  back up.  Then I think we may have addressed your concern, and

16  that's why I thought that was your principal concern.

17         I'm not minimizing what happened October 7th and

18  8th, but I think there's a different way to approach that,

19  and it may not be by way of injunctive relief because some

20  things have already happened.

21         MR. SWEETLAND:  We can't put that -- we can't put

22  that genie back in the bottle, but --

23         THE COURT:  I understand that.  And that's why I

24  asked you, what's your concern?  Your concern is people using

25  that list and actively seeking clients.

1          MR. SWEETLAND:  That's right.  We would like -- To

2    ensure that that doesn't happen, of course, we would like the

3    list back with the representation that there's no further use

4    of that list, and we would like -- we're not satisfied with a

5    handshake or a representation.  We would like an order of the

6    Court instructing that the Defendants return the list and any

7    copies of it and that they not actively solicit, at least

8    during the period of the TRO.

9          THE COURT:  I think there may be a way to accomplish

10   that objective that allows both sides to go forward; again,

11   not minimizing what happened October 7th and 8th.  And I

12   think you probably, with a few minutes, you can probably sit

13   down and craft out some language that the Court -- that by

14   consent you can submit to the Court and the Court can approve

15   it.  And we can -- you know, then we can address how do we

16   resolve the issues of October 7th and 8th, issues that may

17   have -- Well, how we can address those issues, because I'm

18   separating out those issues from what you identified.

19         MR. SWEETLAND:  We understand, Judge.  We want to

20   stop the hemorrhage.  And I don't want to go without saying,

21   these clients are confused.  They're not sophisticated people.

22   They're personal injury clients who are already experiencing

23   the problems of the personal injury, and Your Honor saw the

24   transcript of one telephone conversation of a poor woman who

25   had gotten an oral solicitation over the phone who doesn't

1   know who her lawyer is and she doesn't know that she's going

2   to have help.

3          My client right now doesn't know who his clients are

4   because every day I'm CC'd on e-mails from the Defendants,

5   which I'm fine with the CC, I want to be CC'd on them, saying,

6   "These people are our clients now; give us your files.  These

7   peoples are our clients now; give us your files.  These people

8   are our clients."  My client doesn't know whose claims he can

9   settle; he doesn't know who he's representing.  He's

10  scrambling.  We want to stop the hemorrhage.  We want to stop

11  that situation.

12         THE COURT:  I understand.  I understand that.  I

13  don't think -- I don't think you're that far apart.  I think

14  you can probably do that.

15         Don't get too far away.  Come on up here.  I want

16  you both at the podium here, or the three of you, whatever.  I

17  don't think you're necessarily disagreeing with one another

18  about from this point forward.

19         MR. SALERNO:  I just want to be very --

20         THE COURT:  We're separating out what may have

21  happened last week or the last two weeks, that's another

22  issue, and that probably is easier to resolve -- Well,

23  actually, I think it's easier to resolve, but the Plaintiff's

24  principal contention is now, and that's going forward, is

25  utilization of that client list and efforts to not solicit

1    clients from that list, and that's his principal concern, and

2    I don't necessarily hear you saying that you're unwilling to

3    do that.

4           MR. SALERNO:  I am not saying we're unwilling to do

5    that, but I really want to be clear about a couple of things

6    because there's -- it's just a little bit more complicated

7    than that.

8           THE COURT:  Yeah.

9           MR. SALERNO:  There will be no new letters.  If

10   that's what Your Honor means by solicitation, there will be no

11   additional letters.  Our concern is that --

12          THE COURT:  I think we all know about solicitation.

13   Give us a chance to represent you, that's what it is.

14          MR. SALERNO:  Right.  When a client has responded to

15   a letter --

16          THE COURT:  That's different, a letter that's gone

17   out and maybe gone out during the time of October the 7th,

18   and maybe that former client of the Slocumb firm is now a

19   current client, which alters the scenario.  That's another

20   issue to be resolved.  That's a question of -- well, that's a

21   completely different issue because that former client may well

22   be a current client of the individuals.

23          Now, the circumstances under which that

24   transformation took place may give rise to a action for

25   damages.  I don't know at this point.  But that's completely

1   separate and apart from your request -- wait a minute -- your

2   request for prospective injunctive relief because that's what

3   we're talking about, prospective injunctive relief, and I

4   don't necessarily hear that there is any disagreement with

5   regards to what Plaintiffs want to achieve and what the

6   Defendants are willing to do prospectively, separating out

7   what happened in the flurry of that weekend, that holiday

8   weekend, all right.

9          Everything always happens over the holiday weekend,

10  you know, whether it's a divorce, people -- the breakup of a

11  law firm.  I mean, look, I'm not minimizing it.  I'm not

12  trying to -- I'm not making whim of this.  I mean, this is

13  serious business, but I think we can separate out the two

14  distinct controversies, and I think we have.  And I don't see

15  whether there's any disagreement.

16         Now, the question is what do we put in place to give

17  the Plaintiff the peace of mind that you mean what you say on

18  behalf -- or that your clients mean what they say.  And it

19  seems to me that the parties have already agreed on what can

20  be done.  I can approve that orally because you've told me.  I

21  don't need to send you off for two hours and come back with

22  something that says something completely different from what

23  you just told me.  You've told me what you're willing to do,

24  and I can approve that and say it's done.

25         I'd like to give you an opportunity to reduce it to

writing, but I think I've heard what sounds like an agreement

that deals with the future.  Now, how we deal with the past

may probably be best resolved with mediation efforts because

there's no -- that doesn't factor into requests for

prospective injunctive relief.

MR. SALERNO:  If I may, Your Honor.  I agree with

everything you've just said.  I just want to make sure --

THE COURT:  You agree with everything I just said.

MR. SALERNO:  Yes.  I want to make sure that --

THE COURT:  We've got an agreement then.

MR. SALERNO:  -- two points are clear.  First, that

when clients who have elected to go with Roeser & Whitcom

[sic] come back to either Mr. Roeser or Whitcom and have

conversations about their representations, we won't be here a

week from now with Plaintiff saying, "Ah, that's

solicitation."  So --

THE COURT:  You know, and that's why I'm trying to

parse through all these scenarios.  That's a little bit

different scenario because that client who comes back could

very well be the client who was the subject of what Plaintiff

contends was an inappropriate solicitation.  And without

putting a spin on whether -- on the propriety of that

solicitation, that's a different type of scenario.

That's a different type of scenario, because I don't

think anyone disagrees that there was some communication with

1    the individual attorneys who left the firm over that weekend

2    or maybe prior to with people, with clients of the firm who

3    then became clients of the individuals.

4             There may be an ethical question, and I think there

5    probably is.  There probably are some ethical questions with

6    respect to whether communications with those former Slocumb

7    clients was appropriate, whether or not the communication

8    should have been done well in advance of the attorneys leaving

9    as opposed to locking a door and then communicating.  That's a

10   little bit different scenario from what -- and the way -- we

11   can focus on that.  That's different from what counsel is

12   concerned about right now.

13            I really don't hear any disagreement between what

14   you both are saying, and you disagree with everything I said,

15   and I think I addressed your concern because you're concerned

16   about prospectively using that list, aren't you?

17            MR. SWEETLAND:  That's right, Your Honor.

18            THE COURT:  That's your major concern.  You're not

19   foregoing, or maybe you are foregoing what happened.

20            MR. SWEETLAND:  No.  No, sir.

21            THE COURT:  But that's a little bit different then.

22   That's -- that's a little bit different from a request for

23   injunctive relief because some things have already taken

24   place.

25            MR. SWEETLAND:  They have, Judge.

 1          THE COURT:  And the clients -- and the law firm's

 2    clients may arguably be clients of the individuals now, so

 3    then the question becomes, is there some basis -- was there

 4    some wrongdoing there or not?  Is there a basis for any

 5    compensation for the Plaintiffs?  That's a --

 6          MR. SWEETLAND:  I think the way -- Excuse me.

 7          THE COURT:  Go ahead.

 8          MR. SWEETLAND:  I think the way that it fits into

 9    Rule 65 is that the injunctive component is getting that list

10    back, which is currently in their possession, custody and

11    control.  We want to make sure that all copies of that are

12    done so that in addition to the order by the Court that they

13    aren't to solicit, they don't have the means to solicit to the

14    extent they haven't already done so.

15          THE COURT:  Any problems with that?

16          MR. SALERNO:  Yes.  I mean, these lawyers have to be

17    able to represent and contact their new clients, and --

18          THE COURT:  We're not talking about new clients.

19    We're talking about prospective clients.  We're talking about

20    making contact with not clients who they contend are new

21    clients now because of communications over that weekend; we're

22    talking about future actions and utilization of that list to

23    make future contacts with people on that list.

24          MR. SALERNO:  Well, I think -- I think something

25    needs to be cleared up, because in this verbiage about client

1   lists and trade secrets, I think it needs to be -- something

2   needs to be clear.  These clients -- these two Defendants did

3   not broadly contact all Slocumb Law Firm clients.  The only

4   clients who were represented are those clients for whom they

5   were -- they had primary responsibilities as attorneys at the

6   firm.

7           So the contact information of clients is the contact

8   information of individuals who they represent and represented

9   at Slocumb and now continue to represent them.  They wouldn't

10  want to be in a situation where, you know, what, two days from

11  now, you know, they need to contact one of these clients for

12  purposes of litigation matter, and we're going to hear from

13  the Slocumb Law Firm, "You said you'd give back their contact

14  information," you can't even call them.

15          MR. SWEETLAND:  I think there's an important

16  semantic difference here, Judge, as whose clients they were.

17  These were people who signed retainer agreements.  These are

18  all pre-sue.  This isn't a situation where there's a case in

19  litigation where these young people have entered their

20  appearance on behalf of the clients.  These are -- this is the

21  pre-suit workup with damages and insurance adjustors.

22          So these people signed a retainer agreement with the

23  Slocumb Law Firm.  When these young people left the Slocumb

24  Law Firm, to the extent they had any attorney/client

25  relationship, it terminated at that point.  These were not

their clients.  These clients have relations -- they retained

the Slocumb Law Firm because of its reputation.  They didn't

retain these individuals.  These individuals couldn't carry

that with them then out the door.  That's why Rule --

THE COURT:  Do we know that there's a finite number

of clients, arguably Slocumb clients, who are now clients of

the individual Defendants?

MR. SWEETLAND:  It changes every day.  Every day

it's a drip, drip, drip.  It's 150, it's 175, it's 200.  Every

day we get additional requests from the Defendants asking for

more files.  "We want these people's files tomorrow.  These

people we represent but we don't have their letters yet.

These people, we want you to call their insurance adjustors

and tell the insurance adjustors that we represent them."

It is a nightmare scenario for the Slocumb Law Firm,

and frankly, it's a nightmare scenario for the clients.

MR. SALERNO:  Your Honor, if I may.  All of the

individuals who these two lawyers represented while they were

at Slocumb Law Firm have already been contacted.  At this

point, all we're talking about is followup, the followup where

an individual has --

THE COURT:  Followup with individuals who were

contacted at or around the time that the attorneys left?

MR. SALERNO:  Correct.  You have -- in the papers

attached to our opposition to the TRO motion, you have an

1   example of the actual letters that were sent, and they said

2   three things.  We're leaving, you have --

3          THE COURT:  And this is to a finite number of

4   clients?

5          MR. SALERNO:  This is to a finite number.

6          THE COURT:  How many clients?

7          MR. SALERNO:  Approximately --

8          THE COURT:  I thought it was finite?

9          MR. SALERNO:  It is.  355?

10          MR. HOFFINGER:  387.

11          MR. SALERNO:  387.  And what they said was you --

12   we're leaving the firm.  You can continue to be represented by

13   Slocumb, you can be represented by us at our new firm, or you

14   can be -- you can make other arrangements to be represented by

15   a third party, please let us know.  And that these

16   notifications are starting to come in, and when they come in,

17   Mr. Roeser and Ms. Whitlock forward them to the Slocumb Law

18   Firm and then ask to make arrangements to transfer the files

19   to the new firm.

20          THE COURT:  All right.  So there's 387 cases.

21          MR. SALERNO:  Yes.

22          THE COURT:  387 clients.  All right.  Why can't we

23   parse that number out from the list, the client list, and deal

24   with -- and deal with those two scenarios separately?  I mean,

25   because the contact has already taken place with the 387.

1   Wait just a minute.  With the 387.  Maybe 150 have already

2   contacted and maybe the remaining number, whatever

3   mathematically it is, will contact and maybe if they do decide

4   to retain the individuals, then notify Slocumb, turn your file

5   over, and that's what's causing you the concern.

6         But if you've identified 387 finite cases, to the

7   extent parties can agree on it, and I'll let you have some

8   discovery on that as well, it seems to me that we can separate

9   the 387 out from everyone else who is arguably a Slocumb

10   client and deal with issues of whether or not there's some

11   basis to compensate the law firm for what happened or not in

12   addition to granting prospective relief to you, your peace of

13   mind that they won't solicit any new clients from that list.

14   Whether they have the list or not, they won't do it.

15         Wait just a minute.  And that seems to me that

16   that's what should be done at this point.  And I still don't

17   hear you necessarily -- at least I know a little bit more

18   about the numbers, 387.

19         Now, you may not have comfort with that level, with

20   that number, I don't know, maybe you do, but I'd certainly

21   allow you some discovery into that regard if indeed you

22   disagree with their representation that it's no more than 387.

23   Because there's nothing I can do about what happened in terms

24   of enjoining them.  Enjoining them, that's already happened,

25   it's water under the bridge.  There may be something that can

1  be done either by way of pursuing -- of continuing with the

2  lawsuit or mediation or whatever to compensate Slocumb or the

3  Plaintiff for any real damages.

4        Prospectively, that's what you -- that's what your

5  major concern is.  Some things have happened you don't like,

6  you want it to stop, and they aren't necessarily saying

7  anything to disagree with that.  Yeah.  Go ahead.

8        MR. SALERNO:  Your Honor, Roeser and Whitlock do not

9  have the contact information for anyone other than those 387,

10  and the contacts have already been --

11        THE COURT:  I'll let you have some discovery in that

12  regard as well.  All right.  I appreciate that.  All right.

13  And that's another factor as well.  They're telling me as

14  officers of the Court they don't have that information.

15        So can I just ask this question.  It seems to me

16  that probably the 387 cases were cases that they were actively

17  involved in; is that fair to say?

18        MR. SALERNO:  It is fair to say.

19        THE COURT:  I think we can separate out the two,

20  Counsel, and give you the peace of mind that you want about

21  what happens in the future and then we deal with either

22  settlement or trial or whatever, motions practice about the

23  387 cases and whether or not there's a cause of action to

24  compensate Slocumb Law Firm for what happened over that

25  holiday weekend.

1              MR. SWEETLAND:  Could we ask, Your Honor, to splice

2    this a little bit finer than the 387?  Our concern is 387

3    letters went out.

4              THE COURT:  Right.

5              MR. SWEETLAND:  Our concern, as we've expressed, are

6    these follow-on phone calls that are being made.

7              THE COURT:  To the 387?

8              MR. SWEETLAND:  To the 387.  So we want to make --

9              THE COURT:  And maybe that's part and parcel with

10   that first scenario.  That's already taken place.  They've

11   made contact.  They basically said you got a choice here, go

12   with us or stay with them.  So, if there are damages at all,

13   insofar as Slocumb's concerned, that's already been

14   identified.  That's a separate package from prospectively.

15             They're saying we don't -- they're saying we don't

16   have the list, we don't know of any other client contacts we

17   can make, there's a finite number, 387, for which you may be

18   compensated as a matter of law, I don't know, that remains to

19   be seen, but they're still going to have contact with those

20   387.  Now, maybe that adds to the damages.  I don't know at

21   this point.

22             MR. SWEETLAND:  Well, we're concerned, Judge, that

23   the letters, we can't deal -- there's nothing we can do that

24   about.  That's a fait accompli.  We're concerned -- and some

25   of these people have gone over to them.  There's nothing we

1  can do about that.  Those are those people's choices.

2       Our concern is working the phones, and you know,

3  using that information that they have to strong arm those

4  people.  Strong arm might be too much a word.  To improperly

5  use that to influence them without those people being given a

6  choice, a balance between remaining with Slocumb or moving to

7  this new law firm.

8       So I would ask, Your Honor, that we splice this,

9  that they cannot make any additional phone calls on those 387

10  other than people who have responded affirmatively.

11       THE COURT:  That may be consistent with mitigating

12  any damages also on their part, too.  I don't know if there

13  are damages.  What do you have to say to that?

14       MR. SALERNO:  Your Honor, a couple of things.  No.

15  1, this is all about protection of the clients, first of all,

16  and there are some clients, I'm told, whose matters are in

17  litigation that should be contacted by the lawyer representing

18  them.  To the extent that that's --

19       THE COURT:  Excuse me.  I thought that none of these

20  cases were actually on the public docket anywhere.

21       MR. SALERNO:  I don't know if they're on the public

22  docket, but -- Yes, they are on the public docket.  Slocumb

23  keeps saying that this is nothing other than administrative

24  handling and contacting insurance companies.

25       THE COURT:  Some of these cases are in active

1  litigation?

2           MR. SALERNO:  Yes, there are some cases in active

3  litigation.

4           THE COURT:  Well, if they're in active litigation,

5  seems to me then that's going to trigger whatever rules apply

6  to the litigation.  Lawyers will have to move to enter

7  appearances.

8           MR. SALERNO:  Right.  But there were some

9  individuals who will need to be -- who have not yet sent in

10  their elections who will need to be contacted because there

11  are matters -- there are matters that are coming up that they

12  need to be informed about.  There are -- I'm told that there

13  are six cases in litigation in Maryland and Virginia that are

14  at issue.

15           MR. SWEETLAND:  Judge, we'll cut those out.  They

16  can have them.  My client is not interested about those cases.

17  So, if these people already have their entries of appearance,

18  we will cut them off from the list.  But I don't think -- I

19  wasn't aware that they had entered appearances, but I know

20  that I have authorization from my client to say that if there

21  is something that's in litigation, that's not what --

22           THE COURT:  You're going to have to probably

23  withdraw on those case as well then, your firm.

24           MR. SWEETLAND:  If there's new counsel, certainly

25  we'll withdraw, but I did not understand that any of these

1    people were counsel of record in a case in suit.  If they are

2    counsel of record in a case in suit, if they're the lawyers,

3    absolutely Mr. Slocumb will withdraw.  In fact, he's happy --

4    he's happy to bifurcate those cases out from these other ones

5    that we're talking about that are in pre-litigation.

6              MR. SALERNO:  Some of these people who have not

7    responded have matters in Maryland and Virginia and

8    Mr. Slocumb is not licensed in Maryland or Virginia.  So there

9    is the ability of Mr. Slocumb to continue representing them is

10   a question, and I think these -- these lawyers, with ethical

11   responsibilities towards their client, may need to contact

12   them.

13             THE COURT:  Presumably someone at the firm has

14   entered his or her appearance in those cases in Maryland and

15   Virginia, though.

16             MR. SALERNO:  These individuals --

17             THE COURT:  Those individuals are --

18             MR. SALERNO:  We should make it a little clearer.

19   There are no other lawyers in the D.C. office of Slocumb Law

20   Firm.

21             MR. SWEETLAND:  That's not correct, Your Honor.  In

22   fact, just today, just today one of the Defendants has

23   rejoined the law firm and settled with Mr. Slocumb.

24             THE COURT:  There was cases that -- the charges were

25   dismissed against one individual.  He's rejoined.

1           MR. SWEETLAND:  He's rejoined the firm.

2           THE COURT:  For the record, his name.

3           MR. SALERNO:  Kevin Gracie.

4           MR. SWEETLAND:  Kevin Gracie, Your Honor.

5 Mr. Slocumb, when these individuals left, was in a little bit

6 of a lurch, but he was able to get at least one lawyer in

7 Virginia and Maryland to cover him until he rehired permanent

8 replacements, so these people have been covered.

9           But just to make it easy, Judge, they can have --

10 they can have those cases if that's what it will take to

11 resolve this issue.  We're just -- we're just again worried

12 about these people that haven't responded yet of the 387 they

13 still want to work the phones on, so we would ask if we have a

14 consent order, and I'm happy to do it on the record with Your

15 Honor as opposed to -- because I think that when we -- I think

16 as soon as we're out of Your Honor's presence, that the --

17           THE COURT:  Well, again, I think the 387 cases are a

18 little bit different from what your other concern is about

19 prospectively attempting to contact other clients at the law

20 firm.  I think they should be separated out.  I mean, I just

21 don't see where there's a basis now for granting injunctive

22 relief of those 387 cases.

23           Prospectively, I agree with your concern, you know,

24 and I also accept counsel's representation that they don't

25 have any intent to contact more than they have the means to

1    contact any of those individuals; is that right?

2              MR. SALERNO:  That's right, Your Honor.  Beyond the

3    387, that's right.

4              Now, with respect to the issue of phone calls to

5    clients.  Since the evening of the Friday before Columbus Day,

6    whatever it was, I believe it was the 9th or the 7th.

7              THE COURT:  The breakup weekend.

8              MR. SALERNO:  Mr. Slocumb himself and his assistants

9    and other lawyers from within the firm have begun a -- and

10   from other states, including Alabama, have been -- have

11   started a campaign to call some or all of the 387, and what's

12   happening is very troubling.  This is why the clients are

13   confused.

14             What's happening is that Mr. Slocumb or his

15   surrogates are saying things like Roeser and Whitlock were

16   fired, going with Roeser and Whitlock will delay your cases,

17   he did not turn over -- Mr. Slocumb did not turn over any

18   client files until Tuesday after repeated requests, and we're

19   getting very troubling information that Mr. Slocumb is telling

20   insurance companies, for individuals who have already elected

21   to go with Roeser and Whitlock, that Slocumb still represents

22   them and he's holding up settlement checks.

23             THE COURT:  All right.  I think I have a suggestion

24   along those lines as well, and that would be, seems to me that

25   a letter should go out to each one of those people, 387

1   people.

2          First of all, in telling them that certain

3   individuals who were associated with the Slocumb Law Firm are

4   no longer associated with the law firm, and letting -- and

5   that there's a lawsuit pending, what the principal allegations

6   are by the Plaintiff, what the Defendant's defenses are, but

7   primarily telling the individual client that he or she has a

8   choice.  It's the individual's choice who an individual wants

9   to have as his or her attorney, seems to me.  Wait a minute.

10          And I think that letter should go out and it should

11   be served on the individuals in a way to ensure that everyone

12   gets proper notice and that an individual's rights in

13   litigation won't be jeopardized and that an individual can,

14   within a prescribed period of time, elect who he or she wants

15   to have as his or her attorney.

16          And then that's -- that's principal concern to the

17   Court, these clients who may be confused about what their

18   rights are, and I put that primarily ahead of the controversy

19   that exists now between Plaintiff and Defendant.  But I think

20   that there should be a letter presented and should be approved

21   by the Court and you could say, at court direction, you know,

22   the Court is directing this letter be sent to everyone,

23   indicating that you've got a choice here, folks, and you need

24   to make some decisions by a certain date who you want to

25   represent you, less someone's rights be irreparably

1    jeopardized here and that would be unfortunate, to say the

2    least.

3            MR. SALERNO:  Your Honor, if I may.  My concern is

4    that I would only engender more client confusion because the

5    clients have already received --

6            THE COURT:  Well, they didn't create this problem,

7    all right.  They didn't create this problem, and I think that

8    in fairness to them and they don't know -- I mean, they're --

9    I don't want to use the word victims of this, but there

10   certainly -- their interests are inextricably intertwined with

11   the interests of the attorneys at this point and the Court has

12   some concern as to whether or not someone's rights may be

13   jeopardized.

14           I mean, suppose -- suppose the statute of

15   limitations is slipped somewhere and then there will be a lot

16   of finger pointing about -- Just have a seat, sir.

17           MR. HOFFINGER:  I apologize.  I'm sorry.

18           THE COURT:  Suppose that happens.  Then there will

19   be a lot of finger pointing about whose responsibility it was

20   to file a lawsuit or to do something or to send some 12-309

21   notice within a prescribed statutory period of time, and that

22   concerns the Court and should concern the lawyers as well.

23           So again, I mean, that's probably the third layer of

24   this, you know, what to do about clients who have legitimate

25   questions about who their attorneys are and let the

1    attorney -- let the clients know they have some legitimate

2    choices to make about who they want represent them because you

3    agree, do you not, or is there any disagreement that the

4    clients indeed have some choices here?

5            MR. SALERNO:  This is all about client choice, we

6    agree.  And the letter --

7            THE COURT:  I wish it were all about client's

8    choices.

9            MR. SALERNO:  I mean that.  And the letter that was

10   sent on October 7th, if you haven't had --

11           THE COURT:  But a lot's happened since then, though.

12   A lot's happened since then, and that letter was as people

13   were on their way out the door and it basically gave them some

14   choices, and again, you know, query whether -- query whether

15   the lawyers -- the clients were given sufficient and adequate

16   notice prior to the departure for a client to make an

17   informed, intelligent decision.  I don't know.  I mean,

18   that's -- that's part and parcel of the controversy of one

19   subset of the controversy.

20           So there are three subsets now.  Prospectively what

21   happens, the clients, what to do about the clients, and I

22   think that they should be -- in fact, I'm going to order the

23   letter be sent, a letter, the contents of which shall be

24   approved by the Court.  And the third part of this lawsuit is,

25   what do we -- what do we put in place, what vehicle do we put

1  in place for resolution of Plaintiff's claims against

2  Defendant for what did take place over that holiday weekend.

3  Is there a basis, some basis to compensate them?  Is there a

4  basis for mediation?  You know, is there a basis for motions

5  practice or trial, what have you?  So I think that there are

6  three aspects of this that ought to be dealt with.

7          And, you know, I don't know, maybe we're at the

8  point now where -- I've done a lot of talking.  Maybe we're at

9  the point where I should let you folks sit in the jury room

10  and see if you can't reach some finality with respect to how

11  we proceed from this point forward, but I am principally

12  concerned about those clients out there and I can appreciate

13  why they're confused.  And I'm not finger pointing at this.

14  You know, I'm not doing that at this point, but I'm concerned

15  there may be a lot of confusion on their part, and I don't

16  want that to happen.

17          I think at the very least they should be told, look,

18  even though you may have made a decision about Slocumb Law

19  Firm or the individuals, you still have to let the Court know

20  how you wish to proceed and who you want to represent, and

21  then once we get answers, and I'm sure that we'll get answers,

22  and maybe there will be some people who will be hopelessly

23  confused and they won't know what to do and that's

24  understandable, and if we get to that point, the Court may

25  have to do something else.  But they should be separated out

1    from the present controversy between the attorneys, I think.

2            So we're dealing with those three factors, I think;

3    the clients, you know, what happened over the holiday weekend;

4    and what's the basis -- what's the best avenue for resolution

5    of whatever happened over that weekend; and prospectively,

6    what happens.  I'm not so concerned about prospectively when

7    we separate out everyone else from the 387, because they said

8    we don't know how to contact those folks, so we're not going

9    to make any contact and we don't have a list, that's what

10   they're saying, and I accept that.

11           So, prospectively, I think that that's probably the

12   easiest of the three things to deal with, you know, what kind

13   of schedule do we put in place for what remains because of

14   what happened over the holiday weekend, but that's not going

15   to be complicated at all.  What I'm really concerned about --

16   I'm not minimizing your controversy, but I'm really concerned

17   about those clients out there who may well be hopelessly

18   confused.

19           MR. SALERNO:  Your Honor, there's only -- as far as

20   we know, there's only one client who has expressed any

21   confusion, and that is the -- Ms. Garcia, who was Kevin

22   Gracie's -- who had elected to go initially with Kevin Gracie.

23           THE COURT:  And Kevin Gracie is back at the firm

24   now.  Presumably he's taking the client back to the firm.

25           MR. SALERNO:  So I understand there is a potential

1    for confusion, but the only actual confusion was with respect

2    to that one individual.

3              THE COURT:  Let me ask you this then.  Have you

4    received contact from the remaining 386 people that they want

5    the individuals to represent them?

6              MR. SALERNO:  A significant number have, but those

7    letters keep coming in, you know.  There could be more that

8    came in the mail today.

9              THE COURT:  All right.

10             MR. SALERNO:  My concern is that after a client has

11   received the letter saying you have a choice, complete freedom

12   to choose your attorney, you can go with us, you could stay

13   with the firm, you can go with somebody new, and then --

14             THE COURT:  You know what, I think another letter

15   should go out to everyone anyway saying you still have a

16   choice to make; you realize there's some litigation going on

17   and it's still not too late to make a choice.

18             MR. SALERNO:  Would that go to the individuals who

19   have not yet responded to the --

20             THE COURT:  No, I think it should go to everyone, it

21   should go to everyone, depending on what people have said.

22   There still may be some confusion, and I can understand that,

23   why there would be confusion.  I mean, you worked at a firm,

24   the clients worked at a firm, they were assigned a case, maybe

25   the client came to the firm because of the Slocumb name, you

1    know, maybe they did not come to the firm because of the names

2    of the individual Plaintiffs assigned to work on the case.

3    There could be some confusion, and I think it's just a matter

4    of giving them, letting them make an informed decision.

5           Now there's litigation about what happened, folks,

6    something they may not know.  They don't know about the

7    litigation, unless that's on the television now.  Is that on

8    the television?

9           MR. SWEETLAND:  Well, we have to get William Shatner

10   away from his 80th birthday party, Your Honor, to make that

11   commercial.

12          THE COURT:  All right.  I think that's only fair for

13   the clients.  I'm concerned about them.

14          MR. SALERNO:  Your Honor, I understand the concern.

15          THE COURT:  That's why I'm saying, that's why you

16   don't see a lot of written opinions about these types of

17   issues because, you know, once the bruised feelings -- oh, you

18   know, once the bruised feelings are soothed a little bit,

19   people sit down and say how can we work this out, and I think

20   you folks may be at that point now, I don't know.

21          MR. SALERNO:  For those individuals who have already

22   elected to go with Roeser and Whitlock, I think it would only

23   cause more confusion to say, oh, and you should know there's a

24   lawsuit and we're going to give you the same three options

25   again.

1          THE COURT:  And maybe you're right, and maybe it's

2    just for those individuals who are on the fence.  I don't

3    know.

4          MR. SALERNO:  Yes.

5          THE COURT:  But I'm just raising the question, and I

6    don't know, I haven't -- you know, I mean, someone had asked

7    me an hour ago, was that possible, I probably wouldn't have

8    thought about it because I had no idea what posture this case

9    would be in at, you know, 2:30 this afternoon, but I think

10   we're at that posture now where we need to give some serious

11   thought about --

12         MR. SWEETLAND:  You're right, Judge.  A Court

13   approved letter is the only way, to all 387 people, that Your

14   Honor has a chance, because, you know, and we briefed it.

15   We're not going to go over it again how we think it was skewed

16   and it didn't accurately portray the situation.  So I think

17   Your Honor's suggestion is perfectly acceptable to my client.

18   We'll get a Court approved letter out to the 387 people who

19   are at issue and they will make their choice and we'll see

20   what they say.

21         MR. SALERNO:  There's individuals who have already

22   made their choice and who received a letter that basically

23   says the same thing.

24         THE COURT:  Then you know what, maybe those

25   letters -- maybe those individuals should be separated out and

1    then that -- those individuals that we deal with and we

2    determine or I determine or the parties settle and determine

3    whether or not there's some basis for compensation to the law

4    firm for what happened over the holiday weekend, accepting the

5    fact that maybe they have already made a decision.  Let's say

6    there is -- How many letters are there where people have

7    already made decisions?

8         MR. SALERNO:  Approximately 132.

9         THE COURT:  132.  So maybe we don't send letters to

10   those people, I don't know, but that's not to minimize what

11   happened over the weekend because you're claiming that

12   something terrible happened over the weekend.  That's the

13   reason why those clients are now with individuals and not the

14   Slocumb Law Firm, but they probably can be separated out.  For

15   the others, they'll probably get a letter.

16        What I would like to do is this.  We've talked a

17   lot.  I've talked more than the attorneys, and there was a

18   purpose in doing so to try and get you to the point where

19   maybe it's appropriate for you folks to talk first among

20   yourselves individually and then together and see whether or

21   not you can agree on going forward in a certain way.

22        I don't think there's any -- the least of my

23   concerns now, right now, is future action by the Defendants,

24   and that should be the least of Plaintiff's concerns about

25   future action.  First of all, they don't know how to contact

1    anyone, and I accept their representations, and I'll give them

2    a signed something that they agree not to do that.  The 387,

3    we separate out into two different categories, people who have

4    already committed to go with the individuals, and then we

5    determine, or the Court determines whether there is some

6    cognizable cause of action for damages for what happened

7    there.

8              And the others who have not, you've not heard from,

9    then they get a letter from the Court maybe saying, look,

10   folks, there is some litigation and you still have a choice to

11   make.

12             MR. SWEETLAND:  Can we still get discovery, Your

13   Honor?

14             THE COURT:  I think you're entitled to discovery.  I

15   think that's only fair.  You're entitled to some discovery and

16   you're entitled to get some testimony under oath.  I think

17   you're entitled to that.

18             MR. SALERNO:  Your Honor, and a critical component

19   to this, I think, would be that Mr. Slocumb and his people not

20   call these 387 people and make misrepresentations about the

21   client -- about Mr. Roeser and Ms. Whitlock.

22             THE COURT:  That can be addressed.  I think that the

23   contact with those individuals should be the letter.  It's the

24   letter, and I think that anyone has anything to say to these

25   individuals, it should be in that letter that the Court's

1   going to approve, and I think that's only fair.  And that

2   point is well taken, but I think that that can be accomplished

3   and that can be dealt with in a letter, the contents of which,

4   the form of which is approved by the Court.

5          MR. SALERNO:  And then when these individuals then

6   receive the letter and then go back to both sets of lawyers --

7          THE COURT:  You know what, look, there are going to

8   be some bridges we have to cross in the future, but those are

9   good thoughts, and we can build that into the letter.  If you

10  get to the point where you have questions, then you need to do

11  certain things.

12         MR. SALERNO:  We've already reached that point.

13  That's what I'm trying to say is we have had numerous reports

14  from clients who have elected to be represented by Roeser and

15  Whitcom, reporting saying, hey, I'm going with you guys but I

16  just want to tell you what Mr. Slocumb has been telling, has

17  been saying about you.  So I think we're at that point.

18         MR. SWEETLAND:  Judge, this is -- they can file a

19  motion.  I'm hearing allegations.  I'm asking for the kind of

20  proof that we put in our papers.  If they have these

21  allegations, they will have a compulsory counterclaim against

22  the Slocumb Law Firm for tortious interference and they can go

23  that route.  If they want to file their own motion for a TRO,

24  they can go that route, but I think that these third-hand

25  hearsay about alleged misconduct by our client are not

1   appropriate.

2           THE COURT:   I think that concern is appropriate for

3   further discussion and maybe there should be -- maybe there

4   should be a court order to both sides to prohibit that type of

5   activity, I don't know, so as not to encourage future

6   litigation, counterclaims --

7           MR. SALERNO:   That would be good, Your Honor.

8           THE COURT:   -- and more contention.   And that's

9   something the Court can easily deal with.   I mean, the Court

10  could order both sides not to do certain things.   I'm not

11  really concerned about that right now.   That can be easily

12  addressed.

13          MR. SALERNO:   Thank you, Your Honor.

14          THE COURT:   You know, you folks want to take a few

15  minutes, talk with your colleagues respectively and then maybe

16  talk back there in the back, in the jury room?

17          MR. SALERNO:   Sure.

18          MR. SWEETLAND:   What would you like to have from us,

19  Your Honor, in terms of our work product?

20          THE COURT:   An agreement to settle this lawsuit.

21          (LAUGHTER.)

22          MR. SWEETLAND:   All right.

23          THE COURT:   Let me do this.   Let me huddle with my

24  staff for a second.   But what I want you to do -- I mean, you

25  heard me talk.   I kind of separated things out into three

1   categories.  I want you to go back and first of all see if you

2   can agree on language, and that's not a big deal.  I've heard

3   from both sides.  I think I can -- it would be very easy for

4   the Court to say, "I accept representations of officers of the

5   Court that they cannot and will not contact any clients of the

6   Slocumb Law Firm other than the 387 clients with whom they've

7   already made contact over that holiday weekend," words to that

8   effect.

9         I think that the Court can approve that, and that

10  deals with your concern about future activity by these

11  individuals.  And the others, it's just a matter of, if

12  there's been harm at all or damages, arguably they've already

13  been sustained, right, arguably.  You allege client list was

14  misappropriated, trade secrets, I'm not so sure trade secrets,

15  but you've made certain allegations.

16        Whatever took place over the weekend may result

17  in -- will probably result in further proceedings before the

18  Court.  There will be some discovery, maybe there will be some

19  motions practice.  At some point, maybe sooner than later,

20  both sides will want to speak to a magistrate judge about a

21  settlement, you know, and maybe again you're at that point now

22  but we need to talk about where we go with respect to the 387.

23        The letter, I definitely feel very strongly about

24  the letter.  I think the Court should -- the letter should say

25  something along -- maybe you can't draft the final language of

1    the letter today, but it should be along the lines of the

2    Court -- there is litigation pending, the Court has directed

3    us to send this letter, and it says the following.  The

4    litigation is pending, the claims are so-and-so, you have a

5    choice, you can determine whether the Defendants represent you

6    or the Slocumb Law Firm or you wish to take your business

7    elsewhere because that's another choice that they have, too.

8              MR. SWEETLAND:  And I think at least one has done

9    that, Your Honor.

10             THE COURT:  Yeah.  So, you want to go back in the

11   back or huddle among yourselves?  Yes.

12             The witness rooms.  Carol will show you there are

13   witness rooms that we have available, too.  You can talk among

14   yourselves, and then I think you should take a little bit of

15   time and talk to each other, all right.  If you have any

16   questions, I think those are the -- Let me huddle.  Maybe I

17   overlooked something as well.  Let me huddle with my law clerk

18   as well, and so let me take five minutes before I let you go,

19   okay.  All right.  No need to stand.  Take a five-minute

20   recess.

21             THE DEPUTY CLERK:  This honorable court now stands

22   in a brief recess.

23             (A BRIEF RECESS WAS TAKEN.)

24             THE DEPUTY CLERK:  This honorable court is again in

25   session.

1          THE COURT:  All right.  I want you to go out and

2    talk among yourselves, counsel.  A few thoughts about the

3    letter, and I feel very strongly about this letter to people

4    who have not yet responded.

5          I think the letter -- first of all, the letter

6    probably shouldn't mention litigation.  There is no need to

7    inject that into what may already be a difficult decision for

8    clients to make.  I don't think there's any need to mention

9    this lawsuit.  The letter should give the option, the client

10   has to either stay with Slocumb or go with the Defendants or

11   find some other attorney.

12         And let's assume the letter goes out,

13   hypothetically, in three days, and before we seal the letter,

14   someone has answered one of the form letters that the

15   Defendant sent out, and that could happen, and I think that

16   the letter should also say that in the event you've already

17   made a choice, you still have a final decision to make and you

18   could decide to do something else, you could decide to go with

19   Slocumb or conversely go with the Defendants or choose someone

20   else.

21         There should be a deadline for the client to respond

22   and I think these -- these are time-sensitive issues because

23   of the nature of the type of work that the lawyers do.  These

24   are fee generating cases, personal injury cases, correct?

25   There may be instances, and I'm sure there are, where

1   municipal corporations, cities are sued, all sorts of, as you

2   know, requirements that notice be given to municipal

3   corporations, so people's interests are in jeopardy.  I think

4   it's fair to say that for the people that the Defendants have

5   not heard from, Slocumb still represents those people.

6         Now, for all I know, all those folks may be in

7   Europe on a cruise and haven't received their mail and when

8   they get back they're going to decide to go with the

9   Defendants.  We don't know that.  But there's a need for

10  Slocumb to know what its obligations are, and I think it's

11  fair to say that unless and until the client has said I want

12  to go with Defendants or some other firm, Slocumb still

13  represents them and will continue to discharge representative

14  obligations and responsibilities on behalf of those people.

15        So the deadline should be shorter than longer,

16  probably ten days, two weeks or so.  The letter doesn't need

17  to mention the Court, doesn't need to mention litigation.  I'm

18  going to approve this letter before it goes out, but I want

19  you folks to take a crack at the contents of the letter, and

20  consistent with what bar associations require, the letter

21  should say what the billing practices are.

22        My cursory review of that information in the

23  pleadings is that the Plaintiffs charge 40 percent and the

24  Defendants charge 33-1/3 percent; is that right?  And, you

25  know, the client needs to know that, and -- Now, people change

1   their mind, they can do that.  Plaintiff wants to say we'll

2   charge 33, that's fine.  I'm not going to get into that, but

3   at least the client needs to know what are the billing

4   practices, and that's not inconsistent with what bar

5   associations require, Maryland, Virginia, and D.C.

6          But they don't need to know about this lawsuit.  I

7   mean, first I said that.  They don't need to know about that.

8   They don't need to know that their lawyers on either side are

9   involved in litigation among themselves.  I don't think that's

10  relevant.  They need to know that the principal concern of the

11  lawyers at this point is their interest and their future

12  interests in whatever matter they brought to the -- first to

13  the attention of the Slocumb firm and then they may well end

14  up with the Defendants.

15         But I want you to take a crack at it.  The letter

16  should be shorter than longer, you know, one paragraph, you

17  know, maybe a longer paragraph but no more than that, and

18  we'll talk about the way in which it should be served.  It

19  should be served some sort of return address receipt, et

20  cetera, et cetera.  But that's how we deal with those people

21  for whom no one's heard anything.

22         If you haven't heard anything, I think it's fair to

23  say they're still with Slocumb but they all may be in Europe

24  on a cruise, so we don't know that.  They may all jump ship

25  and come back and have the Defendants or someone else.

1    MR. SWEETLAND:  May I have a moment, Your Honor?

2    THE COURT:  Sure.

3    MR. SWEETLAND:  This is basically giving the

4  Defendants a second run at people who are presumptively, as

5  Your Honor recognizes, the Slocumb Law Firm's clients.

6    THE COURT:  Only because no one's heard from them

7  and we don't know the reasons why.  It may be that they're

8  talking to some other lawyer and trying to figure out what to

9  do.

10    MR. SWEETLAND:  Judge, my client is worse off then.

11  Under these circumstances in bringing the motion, we would

12  respectively dismiss our TRO application with prejudice,

13  because if they're going to get two letters when they haven't

14  responded to the first and they don't respond, they're his

15  presumptive client, he continues to work on them, he's worse

16  off now than he was yesterday.  And so we will -- if -- we

17  would ask Your Honor that this letter that explains it, it

18  goes out to all the 387 so that everybody will be treated

19  equally because that way the people who are still

20  presumptively his clients are treated equally and those people

21  that went with them are treated -- everybody is in the same --

22  is on the same page this way as opposed to giving them a

23  second bite at the apple.

24    We think it's the only fair way to do it; otherwise,

25  I put my client -- we've put our client in more jeopardy by

1   coming here and asking for protection because we're giving

2   them a chance to do all over again what they did before.

3           THE COURT:  Well, if we don't know -- We don't know,

4   first of all, whether individuals have received notice, and if

5   they received it, what they plan to do.  For certain people, I

6   think it's fair to say, they've made a decision.  They sent

7   the letters back, they contacted the Defendants, they've said

8   rightly or wrongly with respect to damages the Plaintiff may

9   be entitled to, they want Defendants to represent them.  This

10  letter only goes out to the people that we don't, simply don't

11  know, and we don't know because they've not responded to

12  Defendants nor have they told Slocumb we want you.

13          They haven't said anything to anyone, have they?

14          MR. SWEETLAND:  Well, we have gotten some.  Actually

15  there are some that have stayed with Slocumb and some have

16  told them orally, so there is some small percentage of that

17  universe.  But again, Your Honor --

18          THE COURT:  And maybe they agree with that.  Maybe

19  the Defendants agree with that, and then for that group of

20  people, then I totally agree they don't need to receive

21  another letter if they've already made a decision similar to

22  the decision that those folks have made for the Defendants and

23  when they told Defendants we want you to represent them.

24          MR. SWEETLAND:  With all due respect, Your Honor,

25  then I dismiss with prejudice our application for temporary

1    restraining order.

2            THE COURT:  That's fine.  Granted.

3            MR. SWEETLAND:  So that we don't have any letters

4    going out.

5            THE COURT:  All right.

6            MR. SWEETLAND:  Because I think that that will make

7    it so much worse for my client, and I apologize for the

8    intrusion of the Court's time.

9            THE COURT:  That's not intrusion.  These are

10   important issues.  No, no.

11           MR. SWEETLAND:  But we -- we canvased among

12   ourselves, and it's clear that if they get a second run at

13   them, he's just -- there's going to be some smaller, then,

14   universe of those people who are going to, just through

15   statistical probability, go with them because people will get

16   confused and they will check off one versus the other.  So we

17   will dismiss with prejudice our TRO application.

18           THE COURT:  Let me invite the attorneys to the bench

19   just for a second then.  I'll grant that motion.  Let me

20   invite the attorneys.  Why don't you cut it off, Carol.

21           COURT REPORTER:  On the record, Judge?

22           THE COURT:  Oh, yeah, and I'll seal it.

23           (AT THE BENCH; ON THE RECORD; SEALED.)

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16          (OPEN COURT.)

17          THE COURT:  All right.  I'm not going to schedule

18  anything further right now.  We'll grant the motion to

19  dismiss, all right.

20          MR. SWEETLAND:  Just dismiss the TRO.

21          THE COURT:  Absolutely.  Not the case.  I understand

22  not the case.

23          (LAUGHTER.)

24          THE COURT:  All right.  And we'll talk again, all

25  right.  I'm not going to schedule anything further at this

1   point, all right.

2           All right.  And I will -- we'll talk.  Leave it at

3   that.  We'll talk.

4           MR. SWEETLAND:  Thank you, Judge.

5           MR. SALERNO:  Thank you, Your Honor.

6           THE COURT:  I want to talk to the students for a

7   second, so the attorneys, you can take your time leaving,

8   okay.  All right.  We're not going to talk about the case.

9   They heard everything.  We're not going to talk about the

10  case.

11          We're going to talk about what first-year law

12  students want to talk about, all right.  All right.  Take

13  care, Counsel.  Good to see everyone.  All right.  I'm going

14  to come down there and we can talk a little bit.

15          (PROCEEDINGS END AT 3:15 P.M.)

16                        *-*-*-*-*

17                **CERTIFICATE OF REPORTER**

18          I, Catalina Kerr, certify that the foregoing is a

19  correct transcript from the record of proceedings in the

20  above-entitled matter.

21

22

23  _____   _____

    Catalina Kerr                    Date
24

25